34. On October 21, 2003, three inmates at MCJ killed inmate Ki Hong in the dayroom where he was housed. Kong was stabbed, beaten and strangled to death while 57 other inmates looked on and no deputies were present at any time during the assault. As a result of this killing, BACA was presented with numerous violations of security and abandonment of duties, lax supervision and discipline amongst the LASD deputies, yet no changes were made and an additional five inmates were killed in the next six months at MCJ.

35. On December 6, 2003, inmate Prendergast was beaten by other inmates at MCJ over the course of several hours as a result of lax supervision, discipline and policy failures. These violations were again presented to BACA.

36. On December 9, 2003, inmate Mario Alvarado, aka Victor Cortez, was killed in a holding cell while awaiting transfer to Pitchess Detention Center. Only a short time after he arrived in the holding cell, he was attacked by several inmates and beaten until he lost consciousness.

37. The inmates who beat Alvarado to death went so long without supervision that they were able to hide his dead body under clothes in a toilet area. Deputies responsible for his whereabouts never followed up on where he was when his name was called. Approximately seven hours after the assault, an inmate cleaning the area discovered Alvarado's body. These violations of supervision were presented to BACA but no disciplinary response was taken.

38. On December 13, 2003, Jose Beas, a pre-trial detainee, was arrested for child molestation although it was later learned that a deputy had falsified the contents of a recording taken of Beas.

39. After being classified as an inmate to be kept away from the general population, Beas was placed in a holding tank with general population inmates where he sustained a beating so severe that he suffered brain damage.

40. BACA was sued as a result of the Beas beating but took no apparent response or action as a result of the deputies' failures that lead to the beating.

FIRST AMENDED COMPLAINT – pg. 6

41. On January 12, 2004, inmate Kristopher Faye, an African-American was stabbed to death by Hispanic inmates after deputies failed to secure cell gates, causing a fight between the two groups.

42. As a result of investigating this incident, numerous violations showing errors in classification, placing highly dangerous inmates with non-violent inmates and failing to supervise were presented to BACA in official reports, yet BACA took no apparent response to any of these reported violations.

43. On April 20, 2004, inmate Santiago Pineda killed inmate Raul Tinajero in his cell at MCJ. Pineda had a history of prior misconduct at MCJ but deputies failed to follow procedures and write disciplinary reports of Pineda's misconduct. Tinajero was scheduled to be a witness in a criminal case against Pineda. Pineda was able to leave his cell unmonitored and he was able to walk across the building to find Tinajero's cell.

44. Due to these numerous failures of monitoring, Pineda was able to enter Tinajero's cell, kill Tinajero and then remain in Tinajero's cell for five hours, undetected by deputies.

45. As a result of the killing of inmate Tinajero, numerous deputy violations in classification, security, discipline, and supervision were presented to BACA in official reports, but BACA did not respond with any discipline of any deputies.

46. On May 23, 2004 inmate Antonio Fernandez was assaulted by at least four other inmates while the assigned deputy. The deputy assigned to monitor the dormitory had abandoned her duties and left her post unattended, for at least 20 minutes while the assault took place.

47. The beating lasted for a long period, sufficient to allow the assailants to Fernandez's body to the rear of the dormitory and conceal it. The errors in the deputy abandoning her post and failing to provide reasonable security and supervision were presented to BACA, yet BACA did not respond with any discipline of the deputy involved.

48. BACA received notice from the Special Counsel to the LASD, in the 17th Semiannual Report (February 2004) and the 18th Semiannual Report (August 2004) of

increasing levels of inmate violence in the jails. The report pointed out that although there was a system in place that reviewed incidents of inmate disturbances and riots with the purpose of review for changes in policy to improve MCJ conditions, that BACA'S system in place for managing this information did NOT provide for its dissemination.

49. In February 2005 BACA received notice from the Special Counsel to the LASD, in the 19th Semiannual Report that deputies at MCJ were costing taxpayers millions of dollars in settlements and verdicts, in cases where the internal investigations found no wrong-doing on the part of the involved deputies.

50. In all, BACA was notified by his Special Counsel that a review of twenty-nine (29) cases involving police misconduct and which settled for $100,000 or more per case over the past five years, only eight resulted in any type of discipline to the officer or policy change in within the Department.

51. BACA was aware of systematic deficiencies in supervision by LASD deputies but failed to make any policy changes, knowing the risk of harm to inmates, as well as any other persons visiting MCJ that would be created by allowing the misconduct to go unaddressed.

52. On February 3, 2005, Special Counsel Merrick Bobb again publically presented findings regarding inmate abuse to BACA, in a report to the County Board of Supervisors. The report stated, "Los Angeles County's largest jail is so outdated, understaffed and riddled with security flaws that it jeopardizes the lives of guards and inmates."

53. The Special Counsel's Report further found that MCJ suffered from "lax supervision and a long-standing jail culture that has shortchanged accountability for inmate safety and security."

54. In August of 2005, the Special Counsel to LASD notified BACA in the 20th Semiannual Report that BACA'S management of the custody facilities resulted in low morale among the deputies. The Report noted a substantial number of deputies in custody

FIRST AMENDED COMPLAINT – pg. 8

assignments leaving LASD for positions with other agencies (sixty-five deputies in five months' time) resulting in insufficient staffing and forced overtime assignments.

55. This Report advised BACA that a deputy should not remain in a custody assignment for more than two years because the stagnation caused problems with the deputies, and resulting in problems for the inmates who took the brunt of the deputies' low morale and anger.

56. Despite being advised of these problems, BACA took no steps to change the assignments of the deputies at any time.

57. On October 24, 2005, inmate Chadwick Shane Cochran was booked into MCJ on a non-violent misdemeanor. His history was one of mental illness and abuse of controlled substances. He was classified for housing in a mental health facility within MCJ, with suicide and assault precautions for his safety.

58. Due to errors by MCJ staff, his protective housing was terminated and he was sent to the general population on November 16, 2005, where he was beaten to death a few hours later that same day.

59. Deputies compounded the error of removing Cochran from protective status and then left a red color identification card that led the attacking inmates to believe he was a "snitch" or informant.

60. The deputies responsible for the safety of these inmates abandoned their posts and failed to supervise the locked day room in which 40 other inmates, some classified as violent "high risk" offenders. Cochran was screaming and many other inmates were yelling for the beating to stop, but no deputy responded.

61. The beating only stopped after Cochran was dead. The inmates had time to hide his body under clothing and food trays. These numerous LASD violations were reported to BACA but no action was taken against any deputies responsible for the failure to supervise the day room and failure to stop the beating at any time.

62. On January 27, 2006, inmate Dion Starr was in custody at MCJ when a group of inmates gathered at his cell door and threatened him with physical harm. Starr yelled for

deputies to come to his aid. Instead of coming to Starr's aid, the LASD deputies opened Starr's cell gate in order to allow the inmates to enter his cell.

63. The inmates entered Starr's cell and he and his cellmate were stabbed repeatedly; Starr was stabbed twenty-three times while he screamed for help.

64. After the inmates finished their attack, the deputies went to Starr who lay on the floor bleeding profusely. One deputy yelled at him, "Nigger lay down," and "Shut up nigger" while he kicked Starr's face, nose and body causing more bleeding and a nose fracture. That deputy then interfered with Starr getting medical treatment for these injuries. These violations were reported to BACA, who took no disciplinary action against any of the deputies involved in the incident involving Starr.

65. The Office of Independent Review's Public Oversight Report 1st Quarter 2007, provided further notice to BACA of deputies abandoning their posts, failing to properly classify inmates, failing to monitor inmates, failing to follow procedures, falling asleep on duty, failing to conduct timely security checks, failing to supervise inmates, often resulting in situations in which deputies used excessive force after situations became out of hand.

66. On May 5, 2010, the ACLU National Prison Project and ACLU of Southern California issued its "Annual Report on Conditions Inside Los Angeles County Jail 2008-2009 ("ACLU Report"). BACA and the LASD have been provided with the ACLU Report.

67. The ACLU Report refers to inmates by number in order to preserve the each inmate's anonymity to avoid retaliation against these inmates for reporting LASD deputy violence and procedures' violations.

68. In the ACLU Report Prisoner 32 reported that deputies had assaulted him "multiple times". On one occasion, he recalled, approximately 10-15 deputies entered his cell and started hitting him. "They dropped me to the floor and started to kick my head," he reported. "They hit me with their flashlights over and over again."

69. Prisoner 32 reported that after the beating he could not walk for two weeks, and even though he needed stitches, he refused medical care because the deputies had